IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

DORA J. ATKINS,

    Plaintiff,

V.                                     CIVIL ACTION NO. 3:07-00320

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

## FINDINGS AND RECOMMENDATION

In this action, filed under the provisions of 42 U.S.C. §§405(g) and 1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

Plaintiff protectively filed her applications on February 4, 2003, alleging disability commencing June 1, 1998,[1] as a consequence of post traumatic stress syndrome, osteoporosis and problems with her shoulders. On appeal from initial and reconsidered denials, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff

---

[1] Plaintiff's insured status expired September 30, 1999, and, for purposes of her application for disability insurance benefits, it was incumbent upon her to establish disability on or before that date. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971).

filed an action in this Court seeking review of the Commissioner's decision. Due to deficiencies in the record, the case was remanded to the Commissioner for further proceedings.[2] Following another hearing, the administrative law judge again found plaintiff not disabled in a decision which became final when the Appeals Council denied a request for review. Plaintiff then filed this action seeking review of the Commissioner's decision.

At the time of the most recent administrative decision, plaintiff was fifty-three years of age and had obtained a high school education. Her past relevant employment experience consisted of work as a bartender, cook and sewing machine operator. In his decision, the administrative law judge determined that plaintiff suffers from "major depressive disorder, post-traumatic stress disorder, borderline intellectual functioning, a chronic pain syndrome, chronic obstructive pulmonary disease, and osteoporosis," impairments he found severe. Though concluding that plaintiff was unable to perform her past work,[3] the administrative law judge determined that she had the residual functional capacity for a limited range of light level work. On the basis of this finding, and relying on Rules 202.21 and 202.13 of the medical-vocational guidelines[4] and the testimony of a vocational expert, he found plaintiff not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision. As has been noted by the Commissioner, the record contains no evidence which could be related back to plaintiff's alleged onset date or to her date last insured, fifteen

---

[2] See, Civil Action No. 3:04-1201.

[3] This finding had the effect of shifting a burden of production to the Commissioner with respect to other work plaintiff was capable of performing. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981); McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

[4] 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 2.

months later.  As a consequence, she fails to establish eligibility for disability insurance benefits.

At the March 26, 2004 hearing, plaintiff testified her biggest medical problem was depression.  She also experiences right shoulder pain, panic attacks, carpal tunnel syndrome in both hands and osteoporosis.  She related that the only limitation she has from the osteoporosis is that she has to be "careful."  She takes medication for all of these problems but indicated she still experiences difficulty with her hands three to four times per week and has panic attacks two to three times per week, lasting from twenty minutes to two hours.   Though she denied any problems with breathing at the hearing, she has a lengthy history of smoking approximately one pack per day and exam findings have been consistent with lung disease.

Plaintiff has received most of her medical treatment through Ebenezer Medical Outreach ("Ebenezer").  The earliest reports, from January 2002, reflect problems with joint pain in the hands and shoulder and depression.  Swelling was observed in the proximal interphalangeal joints in some of the fingers, and plaintiff was prescribed Vioxx for possible osteoarthritis and referred to a counselor for depression.  She reported that Vioxx worked well for the symptoms in her hands but not her right shoulder.  She also reported that Zoloft helped her depression and sleep problems and it was observed that she appeared visibly improved.

An X-ray of the right shoulder, taken on February 3, 2003, was interpreted as negative and she was sent for physical therapy with a diagnosis of tendinitis; however, physical therapy was discontinued after eleven sessions because neither strength nor range of motion had significantly improved.  Apparently injections in the shoulder did not result in improvement either.

When her complaints continued, an MRI was obtained in June 2003, but it too was considered normal.

Dr. Drew Apgar, who evaluated plaintiff for the Commissioner on April 5, 2003, noted complaints of joint pain but not neck or back pain or muscle weakness. He observed she was able to move around, get dressed/undressed and get on and off the exam table without difficulty. Manipulative ability was intact, but grasp was "somewhat" diminished. Gait was normal and plaintiff was able to heel, toe and heel-to-toe walk without difficulty and could squat fully and arise without assistance. Pulmonary exam revealed coarse breath sounds, wheezes, rales and poor air movement, although pulmonary function tests completed at this time were interpreted as consistent with only "mild" chronic obstructive pulmonary disease. Based on these findings, Dr. Apgar diagnosed chronic bronchitis, depression and osteoporosis by history. He specifically noted he found no joint abnormalities or significant compromise of range of motion, and he felt plaintiff may have difficulty only with handling objects with her dominant hand. In September 2003, the orthopedic surgeon at Ebenezer related he could not explain plaintiff's right shoulder symptoms and referred her to Dr. Ozturk at the Cabell Huntington Hospital Pain Clinic. There is no specific information about her treatment there, however.

Following a bone density study in November 2002, plaintiff was prescribed a calcium supplement for what was identified as both osteopenia[5] and osteoporosis.[6] Consistent with her testimony, the medical reports have not indicated this condition causes any problems.

---

[5] A condition marked by a deficiency of bone; the presence of less than the normal amount of bone. Attorney's Dictionary of Medicine O-122 (2007).

[6] A condition in which bone becomes abnormally porous which causes the bone to be weak and brittle. Id. at O-123.

The Commissioner sent plaintiff to Dr. Apgar for a second consultative examination on October 20, 2006. Plaintiff related she was still smoking one pack per day as she had for many years. She also reported reading frequently, using a computer occasionally and watching four hours of televison a day. Again, she had no difficulty moving around or getting on/off the exam table. This time she was observed to be able to squat only halfway and straight leg raising was also noted to be positive while lying down, although range of motion was not limited in the neck, back, shoulders, upper extremities, hips or lower extremities. Tinel sign, indicative of carpal tunnel syndrome, was considered positive bilaterally and grip was decreased in both hands; however, manipulative ability and pinch were considered intact. On examination of the lungs, it was observed that plaintiff had coarse breath sounds and poor air movement. Dr. Apgar diagnosed chronic pain syndrome with possible carpal tunnel syndrome, hyperlipidemia by history, osteoporosis and insomnia. He also noted that chronic lung disease "is apparent," and that there was "no significant compromise" of range of motion anywhere.

This evaluator opined plaintiff would have no problem with standing, walking or sitting but felt there could be "marked" difficulty with lifting, carrying, pushing, pulling and handling objects with the dominant hand. He added, "however, claimant's effort was considered unsatisfactory and the results of testing are viewed as possibly suspect." Dr. Apgar specifically found plaintiff could lift/carry twenty pounds occasionally, ten frequently; had no limitation on sitting or standing/walking; would be restricted in ability to push and pull in both the upper and lower extremities; could occasionally balance, kneel, crouch and crawl; had limited handling (gross manipulative ability); and, should have limited exposure to temperature extremes, dust, humidity/wetness and fumes, odors, chemicals and gases.

With regard to mental functioning, the Commissioner sent plaintiff to John B. Todd, Ph.D., for a psychological evaluation which was performed on April 24, 2003. Plaintiff reported problems with depression as well as panic attacks which she stated occurred two to three times per month. Plaintiff was receiving antidepressant and antianxiety medication and reported she did most of the work around the house though somewhat slower than previously. Dr. Todd observed that she sat with a slumped posture and appeared depressed, irritable and angry. Her affect was mildly blunted, and she was tearful once. He thought her intellectual functioning fell in the low average range. Although recent memory was considered impaired, concentration and pace were only mildly affected. Dr. Todd did comment that plaintiff appeared to have obsessive thinking patterns and paranoia and that she also described a moderate phobia of heights and an avoidance of people because they "drain her." This examiner diagnosed major depression, recurrent, moderate, and post-traumatic stress disorder and assessed a global assessment of functioning ("GAF") of sixty, on the borderline between mild and moderate symptoms or mild to moderate impairment of social, occupational or school functioning.[7] He also did not believe plaintiff had reached maximum medical improvement.

There is no indication plaintiff received treatment for any condition from January 2004 until April 11, 2006, when she was seen by David Clay, a therapist at Ebenezer, for complaints of depression. Plaintiff reported she was restricted to her home because her husband required "constant care." This therapist diagnosed major depression, single episode, moderate, and panic disorder, and assessed her symptoms as being in the moderate range. On September 5, 2006, David

---

[7] See, Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., American Psychiatric Association, 1994 at 32.

Clay wrote to the Wayne County Department of Health and Human Resources expressing the opinion that plaintiff was "indefinitely incapable of gainful employment." He added that plaintiff's symptoms prevented her from interacting with the general public, performing duties associated with a job and, at times, restricting her daily living activities "severely." He cited to no clinical findings or other information to support this opinion.

The following month, David Frederick, Ph.D., evaluated plaintiff for the Commissioner. He commented that she was well-motivated and interacted well with him. Mood was considered "mildly" depressed and anxious with affect restricted and judgment moderately deficient. Immediate memory and concentration were only mildly impaired, however. I.Q. testing produced a verbal score of seventy-nine, performance score of sixty-nine and full-scale score of seventy-two. Though concluding these scores were valid, Dr. Frederick found this indicative of borderline intellectual functioning, not mental retardation. His diagnosis also included major depressive disorder and panic disorder with agoraphobia. Daily activities were reported as taking her grandson to daycare and then picking him up four hours later; babysitting her other grandchildren after school; cooking; laundry; housekeeping; reading; and, sewing.

Dr. Frederick assessed mental residual functional capacity using a form supplied by the Commissioner which contained new rating levels and definitions. He determined that plaintiff had "marked" limitation (severely limited but not precluded) in the areas of interacting appropriately with the general public and responding appropriately to changes in a routine work setting.

A state agency psychologist who reviewed the evidence expressed the opinion that plaintiff would have moderate limitation on her abilities to understand, remember and carry out

7

detailed instructions, maintain attention and concentration for extended periods and complete a normal workday and workweek without interference from psychologically based symptoms and perform at a consistent pace. Another state agency medical advisor expressed the view on June 12, 2003, that, physically, plaintiff had the exertional capacity for light level work requiring no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling as well as avoidance of concentrated exposure to extreme cold. A second physician expressed the view that plaintiff additionally should avoid concentrated exposure to extreme heat and hazards and should avoid "even moderate exposure" to wetness, noise, humidity, vibration and fumes.

The administrative law judge determined that none of plaintiff's impairments met or equaled a listed impairment. Plaintiff objects to this finding and asserts that the performance I.Q. score of sixty-nine, as obtained by Dr. Frederick, meets the criteria of Section 12.05C of the listing. Section 12.05, in general, requires evidence of "significantly subaverage general intellectual functioning" as well as "deficits in adaptive functioning initially manifested during the developmental period; i.e., ... before age 22." Additionally, Part C of this section requires evidence of a "valid" verbal, performance or full-scale I.Q. score of sixty through seventy and a physical or other mental impairment which imposes "an additional and significant work-related limitation of function."

While Dr. Frederick concluded that the performance I.Q. score of sixty-nine was valid, the administrative law judge found otherwise based on factors such as plaintiff's ability to obtain a high school education in regular, not special, classes and her successful work history. Additionally, as the Commissioner notes in his brief, plaintiff admitted she made average grades while in school, is able to read at a high school level, has raised two children, is able to drive and

can perform normal daily activities without apparent limitation due to intellectual limitations. There is simply no evidence establishing that plaintiff currently experiences deficits in adaptive functioning or that she did prior to age twenty-two. The administrative law judge's rejection of the performance I.Q. score is clearly within his authority[8] and is well-supported by the evidence.[9]

   The administrative law judge went on to make findings as to plaintiff's residual functional capacity, determining she was capable of performing light level work but could only occasionally balance, kneel, crouch and crawl and handle objects. He also found she should never be exposed to temperature extremes, dust, humidity, wetness, fumes, odors, chemicals or gases. Mentally, he found plaintiff's ability to make judgments on simple, work-related decisions and to interact with co-workers and supervisors moderately limited (ability to function is satisfactory). Further, her ability to interact appropriately with the public and respond appropriately to work pressures and changes in a routine or usual work setting were found to be markedly limited (severely limited but not precluded). These restrictions are those found by Dr. Apgar and Dr. Frederick after their consultative evaluations in October 2006. The administrative law judge determined they were the most consistent with the evidence and this finding has substantial evidentiary support. He did not find persuasive opinions from Dr. Szendi-Horvath at Ebenezer or plaintiff's therapist, David Clay, that plaintiff was unable to work. A lack of objective and clinical findings supporting these

---

[8] See, Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998), which states that the Commissioner is "not required to accept a claimant's I.Q. scores ... and may reject scores that are inconsistent with the record." See also, Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995); Popp v. Heckler, infra.

[9] See, Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)(per curiam)(The Commissioner is not required to make a finding of mental retardation based on the results of an I.Q. test alone.).

can perform normal daily activities without apparent limitation due to intellectual limitations. There is simply no evidence establishing that plaintiff currently experiences deficits in adaptive functioning or that she did prior to age twenty-two. The administrative law judge's rejection of the performance I.Q. score is clearly within his authority[8] and is well-supported by the evidence.[9]

   The administrative law judge went on to make findings as to plaintiff's residual functional capacity, determining she was capable of performing light level work but could only occasionally balance, kneel, crouch and crawl and handle objects. He also found she should never be exposed to temperature extremes, dust, humidity, wetness, fumes, odors, chemicals or gases. Mentally, he found plaintiff's ability to make judgments on simple, work-related decisions and to interact with co-workers and supervisors moderately limited (ability to function is satisfactory). Further, her ability to interact appropriately with the public and respond appropriately to work pressures and changes in a routine or usual work setting were found to be markedly limited (severely limited but not precluded). These restrictions are those found by Dr. Apgar and Dr. Frederick after their consultative evaluations in October 2006. The administrative law judge determined they were the most consistent with the evidence and this finding has substantial evidentiary support. He did not find persuasive opinions from Dr. Szendi-Horvath at Ebenezer or plaintiff's therapist, David Clay, that plaintiff was unable to work. A lack of objective and clinical findings supporting these

---

[8] See, Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998), which states that the Commissioner is "not required to accept a claimant's I.Q. scores ... and may reject scores that are inconsistent with the record." See also, Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995); Popp v. Heckler, infra.

[9] See, Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)(per curiam)(The Commissioner is not required to make a finding of mental retardation based on the results of an I.Q. test alone.).

opinions was cited by the administrative law judge as the basis for his determination, and his findings in this regard are reasonable and supported by the record.

While plaintiff complained of significant limitations on her functioning as a result of pain and depression/panic attacks, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded that her testimony was not completely credible. He again cited a lack of findings to support her complaints and observed that the treatment notes reflected "benign" findings and indicated that her conditions appeared stable and controlled with medication. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

Finally, a vocational expert was present at the administrative hearing and was presented hypothetical questions by the administrative law judge which contained various assumptions about plaintiff's age, education, work experience and functional capacity and overall medical condition. Under nearly every scenario presented, the vocational expert was able to cite significant numbers of light and sedentary jobs in the national economy which plaintiff could perform. Plaintiff objects to the fact that the assumptions in the hypothetical questions are not identical to those in the administrative law judge's findings and also asserts that she could not perform some of the jobs cited by the vocational expert.

A comparison of the limitations in the hypothetical questions and those found in the administrative law judge's decision reveals that, while some of the limitations are phrased a little differently, there are no significant differences between them. Plaintiff specifically notes that in the hypothetical question the administrative law judge told the vocational expert that her manipulative

ability was limited and there was "some mild loss of grip strength" while in his decision he ultimately found she could only occasionally handle objects. The hypothetical assumptions appear to be more descriptive for the vocational expert and, perhaps, more limiting than what the administrative law judge ultimately found, but there is no significant discrepancy.

Plaintiff goes on to argue that if she could only occasionally handle objects, she could not perform some of the jobs cited by the vocational expert. As the Commissioner responded in his brief, however, plaintiff makes these assertions as a lay person and without pointing to any supporting information. Given the vocational expert's expertise regarding the specific requirements of jobs and greater familiarity with the Dictionary of Occupational Titles, the Court concludes that there is no basis established for questioning his testimony in this regard.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments and residual functional capacity. Under such circumstances, the decision of the Commissioner should be affirmed.

## RECOMMENDATION

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Goodwin and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED: September 10, 2008

*[signature]*
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE